LOWELL L. AND MARILYN A. ROBERTSON, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robertson v. Commissioner
Docket No. 15586-88
United States Tax Court
T.C. Memo 1994-424; 1994 Tax Ct. Memo LEXIS 432; 68 T.C.M. (CCH) 540; T.C.M. (RIA) 94424; August 23, 1994, Filed *432 Decision will be entered under Rule 155. For petitioners: Michael I. Saltzman, Barbara T. Kaplan, and Thomas M. Lawler, Jr.
For respondent: Michael D. Wilder, Steven R. Winningham, Paul N. Schneiderman, and Paulette Segal. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiency and additions to tax in petitioners' Federal income taxes: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) Sec. 6653(a)(2) Sec. 6661
1984
$ 16,135
$ 806.75
50% of the  $ 4,033.75
interest due   on $ 16,135   All section references are to the Internal Revenue Code as amended and in effect for the years in issue, unless otherwise stated. In the notice of deficiency, respondent also asserted an enhanced rate of interest under section 6621(c). We note that section 6621(c) was designated section 6621(d) during the year in question; however, for simplicity, we refer to the provision as section 6621(c). The issues for decision are as follows: (1) Whether the equipment-leasing transaction entered into by the Rosecrea Trust was a sham because it was not entered into with a business purpose and lacked economic *433 substance; (2) whether the Rosecrea Trust acquired the benefits and burdens of ownership of the equipment in issue; (3) whether the purchase money note executed by the Rosecrea Trust represented bona fide indebtedness; (4) whether petitioners were "at risk" under section 465 for all or any part of the liabilities incurred by the Rosecrea Trust to acquire the equipment; (5) whether any resulting underpayment is due to negligence or intentional disregard of rules or regulations; (6) whether any resulting underpayment is a substantial understatement for which there was no substantial authority; (7) whether the transaction at issue is a "tax motivated transaction" resulting in the imposition of interest at the 120-percent rate provided by section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts and attached exhibits are incorporated herein by this reference. Petitioners filed a joint Federal income tax return for their 1984 taxable year. They resided in Paradise Valley, Arizona, when they filed their petition herein. References to "petitioner" are to Lowell L. Robertson. Petitioner is a "unitholder" in an entity called *434 the Rosecrea Trust (the Trust). The Trust was formed by 24 partners and principals of the accounting firm of Touche Ross & Co. (Touche Ross) specifically to facilitate their participation in the transaction at issue. There is no indication that the Trust engaged in any other activities. Respondent has not challenged the passthrough nature of the Trust. All of the issues presented herein involve the Trust's purchase and leaseback of interests in computer equipment in December 1982. The Trust bought certain interests in the computer equipment at the end of three series of transactions in which more than 20 entities participated. One series of transactions involved domestically used equipment manufactured by International Business Machines (IBM), another involved domestically used equipment made by Control Data Corp., and the third involved IBM equipment used in Europe. At the end of each of those series, the Trust acquired certain rights to the equipment in question from Systems Leasing, Inc. (Systems), which, in each case, had acquired such rights from one of two entities controlled by Equilease Corp. Acquisition of the Domestic IBM Equipment by Equilease Marketing
Under *435 an "Equipment Lease Agreement" (Initial User Lease) dated March 3, 1982, CLG, Inc., agreed to lease certain IBM computer equipment to Burroughs Wellcome Co. (Burroughs), a major pharmaceutical company. Burroughs leased the equipment from CLG, Inc., for a 60-month term beginning April 11, 1982, for a monthly rental of $ 92,675.77. The lease was a "net lease", under which Burroughs was responsible for all costs and expenses arising out of the lease or the use of the equipment. To meet its obligation to Burroughs, CLG, Inc., entered into an agreement with IBM to purchase the following equipment (domestic IBM equipment) for $ 4,004,659: Model/
Quantity
Type
Function
Description 1
IBM 3081
D16
Central processor  1
IBM 3082
16
Processor controller  1
IBM 3087
1
Coolant dist. unit  1
IBM 3278
A02
Console  On April 28, 1982, CLG, Inc., assigned all of its interest in the domestic IBM equipment and the Initial User Lease to CLG Enterprises, a partnership in which CLG, Inc., was a partner. On May 19, 1982, CLG Enterprises borrowed $ 3,726,702 from Burroughs to discharge its debt to IBM in regard to the purchase of the domestic IBM equipment. CLG Enterprises *436 issued a promissory note to Burroughs in the principal amount of $ 3,726,702 at a 16-percent annual interest rate. The note required an initial payment of $ 11,434.34 of accrued interest on June 1, 1982, and thereafter monthly payments of $ 92,675.77 over a 58-month period, beginning on July 1, 1982. These monthly note payments precisely offset the payments owed by Burroughs under the Initial User Lease of March 3, 1982. Also, by an "Assignment" dated May 19, 1982, CLG Enterprises assigned to Burroughs all of CLG Enterprise's rights under the Initial User Lease. That assignment provides in pertinent part: FOR VALUE RECEIVED, CLG Enterprises, a Virginia general partnership, (hereinafter called "ASSIGNOR") hereby assigns to Burroughs Wellcome Co. (hereinafter called "ASSIGNEE") all of ASSIGNOR's right, title and interest, but none of ASSIGNOR'S obligations, under the Equipment Lease Agreement dated March 3, 1982 by and between CLG, Inc., as Lessor, and Burroughs Wellcome Co., as Lessee (hereinafter called the "Lease"), and the assignment thereof to ASSIGNOR dated April 28, 1982 (hereinafter called "First Assignment"). * * * ASSIGNOR constitutes ASSIGNEE, its successors and *437 assigns, ASSIGNOR's attorney, irrevocably, with full power (in the name of ASSIGNOR or otherwise) to demand, receive and give releases for any and all moneys and claims for money due and to become due under or arising out of the Lease and First Assignment * * * * * * ASSIGNOR does hereby warrant and represent that the Lease or First Assignment are in full force and effect; that there is no default or cause for default thereunder; that it has not assigned or pledged and hereby covenants without ASSIGNEE's prior written consent it will not assign or pledge, so long as this Assignment shall remain in effect, the whole or any part of the rights hereby assigned to anyone other than ASSIGNEE, its successors or assigns * * *
By a "Security Agreement" dated May 19, 1982, CLG Enterprises also granted to Burroughs a security interest in the domestic IBM equipment. CLG Enterprises sold its remaining interest in the domestic IBM equipment to Equilease Marketing Corp. (Equilease Marketing), an unrelated company, on May 12, 1982, for $ 440,512. The "Purchase Agreement" between those two entities acknowledges in the following manner the impending loan transaction with, and assignment to, *438 Burroughs that are described above: To finance the purchase price of the Equipment Seller [CLG Enterprises] expects to obtain a non-recourse loan (the "Loan") from a lender (the "Lender") in an amount not to exceed $ 3,726,702.37, such loan to be secured by a lien on the Equipment and an assignment of basic rental under the Lease and to be fully paid-off by such basic rental * * * * * * Subject to the terms and conditions hereinafter set forth, Seller agrees to sell, assign, transfer and convey to Buyer [Equilease Marketing], and Buyer agrees to purchase from Seller, (i) the Equipment and (ii) all of Seller's right, title and interest in and to the Lease.
On May 25, 1982, Burroughs and Equilease Marketing executed a "Consent and Agreement". In that document, Equilease Marketing acknowledges that Burroughs' rights under the Assignment of May 19, 1982, supersede the ownership rights of Equilease Marketing, which were acquired under the Purchase Agreement of May 12, 1982. The Consent and Agreement provides, in pertinent part: WHEREAS CLG [Enterprises] has entered into a Security Agreement (the "Security Agreement") dated May 19, 1982 with [Burroughs] Wellcome pursuant *439 to which it has granted [Burroughs] Wellcome a security interest in the Lease and Equipment to secure payment of an Installment Note (the "Note") between CLG [Enterprises], as Maker, and [Burroughs] Wellcome, as Payee, in the amount of $ 3,726,702.38, dated May 19, 1982; and WHEREAS to evidence its grant of a security interest in the Lease to [Burroughs] Wellcome, CLG [Enterprises] and [Burroughs] Wellcome entered into an Assignment (the "Assignment") dated May 19, 1982; * * * Equilease [Marketing] acknowledges that it has acquired the Equipment and the Lease subject to the security interest of [Burroughs] Wellcome therein to secure amounts due under the Note and the Security Agreement, such security interest being created by the Security Agreement and the Assignment, and agrees to subordinate its right, title and interest in the Equipment and the Lease to the security interest of [Burroughs] Wellcome, its successors and assigns.
Acquisition of the CDC Equipment by Equilease Marketing
Early in 1982, Equilease Marketing purchased the following peripheral equipment (the CDC equipment), from Control Data Corp. for $ 249,622: Model/
Quantity
Type
Function
Description 1
CDC 38304
2
Controller with 2  channel switches  2
CDC 33502
A2
Disk storage unit  6
CDC 33502
B2
Disk storage unit  *440 Equilease Marketing leased the CDC equipment to First Computer Corp. (First Computer), pursuant to a net lease dated April 23, 1982 (Initial User Lease). The lease calls for First Computer to make payments of $ 7,500 each month over a 37-month term but does not indicate the date on which the lease term was to begin. Pursuant to a "Guaranty" dated June 29, 1982, First Bank System, Inc., guaranteed First Computer's performance under the Initial User Lease. On September 1, 1982, United Jersey Bank (UJB) lent Equilease Marketing $ 214,044. Also on that date, Equilease Marketing issued a note to UJB in the principal amount of $ 214,044. The note bore interest at a 16.75-percent rate and was payable in 36 monthly installments of $ 7,500. On the same date, UJB and Equilease Marketing also entered into a "Loan and Security Agreement" to secure the $ 214,044 loan. The collateral identified in the Loan and Security Agreement consisted of the CDC equipment and Equilease Marketing's rights in the Initial User Lease with First Computer. The agreement provides as follows: Borrower [Equilease Marketing] hereby grants a continuing security interest to UJB in the Collateral including, *441 but not limited to all of the monies, rentals, accounts, accounts receivable, general intangibles, chattel paper, contract rights and all other rights and benefits due and hereafter to become due or otherwise to accrue to the benefit of Borrower pursuant to the Lease * * * and specifically including a security interest in the Computer described in the Lease. * * * UJB is specifically granted the right to demand and receive from the Lessee all monies due and to become due pursuant to the Lease * * *
By an undated "Acknowledgement of Assignment and Agreement" (Acknowledgement), First Computer agreed to pay directly to UJB the $ 7,500 monthly rental fee that it owed to Equilease Marketing under the Initial User Lease. As of September 1, 1982, 36 monthly payments of $ 7,500 remained unpaid under the Initial User Lease. Thus, the payments from First Computer would precisely satisfy the obligations of Equilease Marketing to UJB. Sales to Equilease Partnership and to Systems
By "Purchase Agreement" dated December 28, 1982, Equilease Marketing sold its interest in the domestic IBM equipment and the CDC equipment to a related entity named Equilease Associates I Limited Partnership *442 (Equilease Partnership). The Purchase Agreement provides that: The purchase price * * * for the Covered Equipment is the amount set forth as the Covered Equipment Price in the Schedule [$ 4,425,276.37], payable concurrently with the execution and delivery of this Agreement, as follows: (i) by payment to the Vendor [Equilease Marketing] of the amount (the "Down Payment") set forth in the Schedule as the Down Payment [$ 484,530], in immediately available funds; and (ii) by acquiring the Equipment subject to the Applicable Lien.
The Purchase Agreement explains the term "Applicable Lien" as follows: In connection with its acquisition of the Covered Equipment, Vendor [Equilease Marketing] borrowed from a lender (the "Lender") a portion of the purchase price (the "Applicable Indebtedness") and, as security for payment of principal of, and interest on, the Applicable Indebtedness granted to the Lender a security interest in the Equipment and assigned to the Lender [Burroughs or UJB] the rentals payable by the Applicable Initial User under the Applicable Initial User Lease (collectively, the "Applicable Lien"). The agreements, instruments and other documents creating, or otherwise *443 affecting, the Applicable Indebtedness or the Applicable Lien are sometimes hereinafter referred to as the "Lien Documents".
In the Purchase Agreement, Equilease Marketing assigned to Equilease Partnership its interest in the Initial User Leases as follows: Vendor [Equilease Marketing] hereby assigns to purchaser [Equilease Partnership] all of the right, title and interest of lessor under the Applicable Initial User Lease, subject and subordinate, however, to the rights of the Lender [Burroughs or UJB] under the Lien Documents.
On the same date, December 28, 1982, Equilease Partnership sold its newly acquired interest in the domestic IBM equipment and the CDC equipment to Systems Leasing, Inc. (Systems), for $ 4,423,550. Systems paid $ 609,193 in cash and issued a "Purchaser Note" in the principal amount of $ 3,814,357, which bore interest at an 11.98-percent annual rate. Under the Purchaser Note, Systems was to make quarterly installments payments of $ 129,409.95 during 1983 and $ 199,758.97 thereafter, through December 1990. The Purchaser Note contains the following additional provision: The undersigned [Systems] and each party assuming the undersigned's obligations *444 hereunder are sometimes hereinafter referred to collectively, as the "Payor * * * * * * Payor shall have the right * * * to set-off against any amount * * * then due to be paid hereunder, the amounts then due to be paid to Payor under the Master Lease, but unpaid.
Also on December 28, 1982, Systems and Burroughs entered into a "Subordination and Consent Agreement". As part of that agreement, Systems recognized that "The Equipment and User Lease are subject to, among other things, a Security Agreement and a Collateral Assignment dated May 19, 1982" between Burroughs and CLG Enterprises. Leaseback of the Domestic IBM and CDC Equipment
On December 28, 1982, the same day that it acquired rights in the domestic IBM equipment and the CDC equipment, Systems leased those rights back to Equilease Partnership. The "Master Lease Agreement" (Master Lease) spanned 96 months, ending on December 31, 1990. Equilease Partnership was to make quarterly "fixed rent" payments during the term of the lease: $ 129,409.95 during 1983 and $ 199,758.97 thereafter, through 1990. These fixed rents total $ 6,110,890 and precisely equal the note payments due from Systems to Equilease Partnership *445 under the Purchaser Note. The Master Lease also provided that Systems was to receive "contingent rent" consisting of 50 percent of the net remarketing proceeds from any subsequent lease of the equipment between expiration of Initial User Leases and the end of the Master Lease. The Master Lease further provided that: Lessee [Equilease Partnership] shall have the right, exercisable upon notice to Lessor [Systems] to set-off against any amounts of rent then due to be paid hereunder, any amounts of principal, interest or both then due to be paid to Lessee under the Purchaser Note.
On December 28, 1982, Equilease Corp., which controlled all the Equilease entities herein discussed, entered into a "Capitalization Agreement" with Systems. The agreement provides that: So long as Lessee [Equilease Partnership] shall receive, when due, each payment due to be paid to it under the Purchaser Note, Equilease [Corp.] shall make such loans, advances or capital contributions to the Lessee as are necessary to ensure the payment by Lessee, when due, of Rent. * * *
Acquisition of the Foreign IBM Equipment by Equilease International
A German manufacturer, DuPont de Nemours Deutschland *446 GmbH (DuPont), purchased the following computer equipment (the foreign IBM equipment) from IBM in October 1982: Quantity
Type
Model
Description 2
IBM 4341
L01
Central processor  2
IBM 3350
A02
Direct access storage  1
IBM 3350
A2F
Direct access storage  6
IBM 3350
B02
Direct access storage  3
IBM 3350
B2F
Direct access storage  2
IBM 3803
2
Tape control  4
IBM 3420
8
Tape unit  The total price was 1.999.999,42 DM ($ 780,243.90). The equipment was already installed at DuPont at the time of its purchase. Klaus W. Schafer and Partner GmbH (Schafer) purchased the foreign IBM equipment from Dupont for 2.007.241,60 DM ($ 783,069.32) on October 29, 1982. On the same date, Schafer leased the equipment back to DuPont, pursuant to a net lease (Initial User Lease), under the following terms: Leasing Length
Rent Per
Certificate Quantity
Model of Lease
Month 1
1
4341-L01
48 months
9,945 DM
2
1
4341-L01
48 months
11,667 DM
3
1
3350-A2F
36 months
18,030 DM
2
3350-A02
36 months
3
3350-B2F
36 months
6
3350-B02
36 months
4
2
3803-002
36 months
7,865 DM
4
3420-008
36 months
On November 11, 1982, *447 Schafer sold its interest in the foreign IBM equipment, plus its rights and obligations in the DuPont Initial User Lease, to Chemco Leasing GmbH (Chemco). The price was 2.052.241,60 DM ($ 800,435.12). Of that amount, Chemco agreed to pay 2.007.241,60 DM ($ 783,069.32) directly to DuPont to fulfill Schafer's obligation to DuPont. Chemco was to pay the balance, 45.000 DM ($ 17,365.80), to Schafer. On November 18, 1982, pursuant to a "Purchase Agreement", Chemco sold to Equilease International GmbH (Equilease International) its interest in the foreign IBM equipment. The Purchase Agreement provides that the purchase was made "subject to the rights of the Initial User [DuPont] under the Initial User Lease." Equilease International did not purchase Chemco's right to receive rent under the Initial User Lease. The Purchase Agreement also provides that, following the purchase, Chemco was authorized to: borrow from a third party (a "Lender") an amount (an "Indebtedness") equal to all, or any portion of, the Net Rental (as hereinafter defined), discounted to present value at the discount rate agreed upon by Seller and the Lender (an "Interest Rate") and, in connection with such borrowing, *448 to assign to the Lender, by way of security, such Net Rental, but only if the Indebtedness secured by such assignment, plus interest thereon, is fully serviced and liquidated by the Initial User's payment, when due, of such Net Rental * * *
The stated price under the Purchase Agreement was 3.022.490 DM ($ 1,177,807.60). Equilease International paid 218.301 DM in cash ($ 85,067) and issued a "Limited Recourse Installment Promissory Note" in the principal amount of 2.804.189 DM ($ 1,092,739.80), bearing interest at 5 percent semiannually. The note required 14 consecutive semiannual payments of 269.800,30 DM ($ 105,136.11). The note was in fact nonrecourse, and provided that Chemco could look only to the "collateral", an undefined term, in satisfaction of the obligation. Also on November 18, 1982, pursuant to a "Lease Agreement", Equilease International leased its interest in the equipment back to Chemco for 7 years. The lease required 14 consecutive semiannual payments of "Aggregate Rent" in the amount of 269.800,30 DM ($ 105,136.11). Thus, those payments precisely offset Equilease International's note payments. The lease provided that Chemco would receive "Additional Rent", *449 equal to a share of any net remarketing proceeds generated between the expiration of the Initial User Lease and the termination of the Lease Agreement. This share ranged from 25 percent to 60 percent. On the same date, Equilease International and Chemco entered into a "Collateral Assignment Agreement". The agreement provides as follows: Assignor [Chemco] hereby assigns to Assignee [Equilease International], by way of security all of Assignor's right, title and interest in, to and under: (i) the Initial User Lease and each and every subsequent User Lease; (ii) all User Lease Proceeds; (iii) any and all collateral or security given for the performance of User Leases or any of them; and (iv) any and all of the rights and remedies of Assignor under User Leases (collectively, the "Lease Collateral"). * * * Notwithstanding the assignment effected hereby, however, Assignee shall not proceed against any User Leases, or collect User Lease Proceeds, or exercise any other rights hereunder with respect to the Lease Collateral, except upon the occurrence and during the continuance of: (i) an Event of Default under the Lease; or (ii) any other default by Assignor in the payment or performance, *450 when due, of the Assignor Obligations which, if capable of being cured, is not cured within ten (10) days of Assignee's notice thereof to Assignor (any such Event of Default or other default being herein referred to as a "Default"). So long as no Default shall have occurred and be continuing, all User Lease Proceeds received by Assignor under, and in accordance with, each User Lease shall be received by Assignor free and clear of the rights of Assignee under this Collateral Assignment Agreement, and Assignee shall have no claim thereto and shall not be entitled to trace such User Lease Proceeds in the hands of Assignor * * * [Emphasis added.]
Assignment of the Foreign IBM Equipment to Equilease C.V. and Its Sale to Systems
On December 31, 1982, Equilease International entered into an "Assignment Agreement" with Equilease Equipment Brokerage C.V. ("Equilease C.V."), a Netherlands corporation. Under the Assignment Agreement, Equilease International transferred to Equilease C.V. all of its rights in the foreign IBM equipment and any rights that it held in any leases or other agreements pertaining to that equipment. The parties to that agreement acknowledged that "This *451 Assignment is made subject to any existing leases, liens or fiduciary rights". Pursuant to a "Master Purchase Agreement" dated December 28, 1982, Systems purchased from Equilease C.V. all of the interest of Equilease C.V. in the foreign IBM equipment. The record provides no explanation of how Equilease C.V., on December 28, 1982, transferred rights that it would not acquire until 3 days later. The stated purchase price of the interest in the equipment was $ 1,208,996. Systems paid $ 139,034.54 in cash and issued a "Purchaser Note", dated December 28, 1982, in the principal amount of $ 1,069,961.46, bearing interest at 14.39 percent per annum. During the 8-year term of the Purchaser Note, Systems was to make quarterly note payments to Equilease C.V. of $ 39,532.55 in 1983 and $ 61,022.48 thereafter, through 1990. The Purchaser Note also provides as follows: The undersigned [Systems] and each party assuming the undersigned's obligation hereunder are sometimes hereinafter referred to collectively, as the "Payor" * * * * * * Payor shall have the right * * * to set-off against any amounts * * * then due to be paid hereunder, the amounts then due to be paid to Payor under *452 the Master Lease, but unpaid.
Leaseback of the Foreign IBM Equipment
On the same date, December 28, 1982, Systems leased its interest in the foreign IBM equipment back to Equilease C.V., subject to the prior liens and lease rights. This "Master Lease Agreement" (Master Lease) ran for 96 months, ending on December 28, 1990. Under the Master Lease, Equilease C.V. agreed to make quarterly "fixed rent" payments of $ 39,532.56 in 1983 and $ 61,022.98 thereafter, through December 31, 1990. Thus, the fixed rent owed to Systems would almost exactly equal the note payments owed by Systems. Systems was also entitled to "contingent rent" equal to 50 percent of net remarketing proceeds generated between the termination of the DuPont Initial User Lease and the end of the Master Lease term. On December 28, 1982, Equilease Corp. entered into a "Capitalization Agreement" with Systems. The agreement provides that: So long as Lessee [Equilease C.V.] shall receive, when due, each payment due to be paid to it under the Purchaser Note, Equilease [Corp.] shall make such loans, advances or capital contributions to the Lessee as are necessary to ensure the payment by Lessee, when due, *453 of Rent. * * *
Purchase of the Equipment by the Rosecrea Trust
A. Formation of the Rosecrea Trust and Negotiation of the Deal
The Trust was formed in 1982 under the laws of the State of New York specifically to enter into the purchase and leaseback with Systems that are at issue. The Trust had 24 beneficial owners (unitholders), including petitioner. In 1982, each unitholder was either a principal or a partner in the accounting firm of Touche Ross. One of the unitholders, Mr. Alan Bernikow, acted as trustee. In 1982, Mr. Bernikow was the assistant to the managing partner of Touche Ross and head of its mergers and acquisitions department. Mr. James Crumlish was the unitholder instrumental in organizing the Trust. Mr. Crumlish met Mr. Allen Jordan, the president of Systems, in the summer or fall of 1982. At the time of their meeting, Mr. Crumlish hoped to develop Systems as a Touche Ross client. In fall 1982, Messrs. Crumlish and Jordan formulated a computer sale and leaseback transaction between Systems and a group to be organized by Mr. Crumlish. The pair decided that the deal would involve the domestic IBM equipment, the CDC equipment, and the foreign *454 IBM equipment. The purchasers would acquire Systems' interest in the equipment and assume Systems' rights and responsibilities under the Master Leases with the Equilease entities. The purchase price was not negotiable; it was determined by the results of a valuation obtained by Systems. However, Messrs. Jordan and Crumlish did negotiate the amount of the downpayment. The rate of interest on the note to be issued by the purchasers was then set to ensure that the note payments precisely equaled the fixed rent payments due from the Equilease entities under the Master Leases. Mr. Crumlish insisted that Systems provide a written valuation of the equipment and a tax opinion. During the negotiations, Mr. Crumlish reviewed projections provided by Systems, which depict the anticipated financial and Federal tax results of the transaction. When Mr. Crumlish felt that the deal would move beyond the negotiation phase, he presented the projections to Mr. Bernikow. Mr. Bernikow then passed on the projections to other Touche Ross partners and principals in an effort to attract investors. The projections indicate that income would flow to the Trust from three sources: A total of $ 7,723,376 *455 in "fixed rent" to be paid by Equilease C.V. and Equilease Partnership over the 8-year term of the Master Leases; an estimated $ 914,175 in re-leasing income during 1985-1990; and projected sales receipts on disposal of the equipment in 1990 at prices reflecting 20 percent, 25 percent, and 30 percent of the 1982 sales price of $ 5,170,392. The projections further show that, after claiming interest expense and depreciation deductions, the Trust would generate losses of $ 3,602,708 in excess of income from 1982 through 1986. They also show that, from 1987 through 1990, the Trust would generate at least a total of $ 4,493,551 of net taxable income, provided that the Trust sold the equipment for at least 20 percent of its 1982 purchase price. Thus, the projections indicate that, by the end of 1990, the investment would generate at least $ 890,843 of total taxable income. However, if the equipment had zero residual value at the end of 1990, the trust would incur a total net loss of approximately $ 40,000. But, even in the event of this loss, the Trust would obtain a "cumulative benefit" of $ 387,159, consisting of tax benefits and income from re-leasing, invested at 10 percent. At *456 the time of the negotiations, Mr. Crumlish had very limited experience with computers and he had investigated no other potential computer leasing deals. Mr. William Atkins and Mr. Charles Biggs, the Touche Ross computer systems consultants, analyzed the deal before investing in the Trust, but only after the equipment mix and the terms of the deal had been finalized. Mr. Crumlish did little investigation of Systems, other than learning that Mr. Jordan was a licensed securities trader. By the time of trial, respondent had issued to Mr. Crumlish a statutory notice of deficiency pertaining to his involvement in the transaction at issue. B. Investment Information Provided to Unitholders
1. The Investment Memorandum
The trustee provided to prospective unitholders an "Investment Memorandum", which had been prepared by Austrian, Lance and Stewart (Austrian, Lance), attorneys to Systems. Among other things, the Investment Memorandum describes the equipment involved in the transaction, as well as the earlier sales, financing, and leasing of the equipment. The Investment Memorandum notifies prospective unitholders that the Trust was to purchase the equipment subject to *457 prior security interests in the equipment and in the Initial Users Leases, which had been granted to lenders and to other third parties. It specifically informs prospective unitholders that: The Foreign Equipment will be acquired by the Trustee, on behalf of the Unitholders, already encumbered by the Foreign User Lease and the Foreign Sublease, and the Foreign Bank Lien. The benefits of the Foreign User Lease and the Foreign Sublease (and any subsequent sublease of the Foreign Equipment) will flow to parties other than the Trustee or the Unitholders * * * The Domestic Equipment will be acquired by the Trustee, on behalf of the Unitholders, already encumbered by the Domestic User Leases and the Domestic Bank Liens. The benefits of the Domestic Equipment will flow to parties other than the Trustee or the Unitholders * * * Although the rents payable under the User Leases * * * will be collaterally assigned to the Trustee as security for the performance of the Domestic Lessee's obligations under the Domestic Lease, that assignment will be subject and subordinate to the prior rights of the Domestic Banks to receive proceeds of the collateral until the Bank Domestic Debts [sic] are *458 paid.
The Investment Memorandum further notifies the prospective unitholders that Austrian, Lance, which provided the Investment Memorandum and the Tax Opinion attached thereto, serves as counsel to Systems, to Equilease Corp., and to some Equilease affiliates. The first page of the Investment Memorandum warns as follows about the risks of participating in the Trust: THE PROJECTIONS CONTAINED IN THIS MEMORANDUM HAVE BEEN PREPARED ON THE BASIS OF INTERPRETATIONS OF FEDERAL INCOME TAX LAW WHICH ARE LIKELY TO BE CHALLENGED BY THE INTERNAL REVENUE SERVICE. THE PROJECTED RESULTS OF INVESTMENT ARE BASED UPON THE MOST FAVORABLE TAX TREATMENT POSSIBLE OF A NUMBER OF ISSUES AND UPON THE SPECIFIC ASSUMPTIONS STATED AS TO CERTAIN TAX ELECTIONS MADE OR TO BE MADE BY INVESTORS. IN THE EVENT OF AUDIT, AN ADVERSE FINAL DETERMINATION ON ANY OF THOSE ISSUES MIGHT SIGNIFICANTLY REDUCE OR ELIMINATE VIRTUALLY ALL PROJECTED TAX BENEFITS OF AN INVESTMENT. * * * AN INVESTMENT IS SUBJECT TO SIGNIFICANT ECONOMIC AND TAX RISKS AND IS SUITABLE ONLY FOR PERSONS QUALIFIED TO ASSUME THOSE RISKS. * * *
2. The Tax Opinion Letter
Appended to the Investment Memorandum is a Tax Opinion Letter, *459 dated December 15, 1982, written by Austrian, Lance. The "Facts" section of the Tax Opinion provides a description of the deal at issue and the transactions preceding that deal. It explains as follows the interests in the equipment and the Initial User Leases that had been assigned to Burroughs, United Jersey Bank, and Chemco: Burroughs Wellcome Company and United Jersey Bank (the "Domestic Banks"), each * * * received a security interest in a portion of the Domestic Equipment and an assignment of the rents from one of the Domestic User Leases * * * [Chemco] received a security interest in the Foreign Equipment and in the Foreign User Lease rents * * *
The body of the Tax Opinion examines four bases on which Respondent could be expected to challenge the substance or characterization of the deal. The first, which is not at issue in this case, is the Trust's legal status as a trust, rather than as an association or partnership. The second is the characterization of the deal as financing arrangement, as opposed to a sale-leaseback. In that respect, the Tax Opinion discusses and , *460 affd. per curiam . In distinguishing between financing arrangements and sale-leasebacks, the second portion of the Tax Opinion also examines factors bearing upon whether the Trust will be considered to have assumed the benefits and burdens of ownership of the equipment. The third area discussed is the includability of the Trust Note in the unitholders' basis in the equipment. In examining this potential problem, the Tax Opinion examines, inter alia, , affd. , , and . Although Austrian, Lance opined that the amount of the Trust Note should increase the unitholders' basis in the equipment, the firm warned that: It is possible, however, that if the fair market value of the Equipment is less than the amount of its purchase price, all or a portion of the Trust Note may not be includible in the Unitholders' basis in the Equipment for the purpose *461 of computing depreciation thereon and that interest deductions could be reduced or denied.
The final portion of the tax opinion deals with the at risk rules. This portion is divided into subsections analyzing three requirements: (1) That the borrowers be personally liable on the note; (2) that, under section 465(b)(3), the lender have no interest in the borrower's activities, other than that of a creditor; and (3) that the transaction not be an arrangement limiting loss. In regard to each of the four possible challenges discussed, Austrian, Lance concluded that "it is more likely than not" that petitioners are entitled to the Federal income tax treatment that they have claimed on their return. 3. Communigraphics Valuation
Also attached to the Offering Memorandum was a valuation of the equipment at issue, which was commissioned by Systems from Communigraphics, Inc. (Communigraphics). John Wilkins, the president of Communigraphics, valued the equipment. The document submitted by Communigraphics contains a three-page "Industry Background", which explains the history of magnetic tape units, disk storage units, and the IBM families of central processing units. Four attached *462 exhibits catalog the equipment to be valued and their list prices. The valuation itself consists of a single page. It first states the length of each of the Initial User Leases and the rental fees due under each. The valuation then estimates the December 1982 present value of the Initial User Leases to be $ 4,331,327. We note that the Trust acquired no rights to the proceeds from the Initial User Leases. The valuation next estimates the 1982 present value of the residual values of the equipment at the end of the Initial User Leases to be $ 936,388. Mr. Wilkins totaled those figures to reach his valuation of $ 5,267,715 for the equipment. The valuation contains no estimate of the residual values as of the end of the Master Leases. There is no explanation of the methodology that Mr. Wilkins used in making his appraisal. C. Unitholders' Evaluation of the Equipment
1. William Atkins
At the time of trial, William Atkins was the National Managing Director for Information Technology Consulting at Deloitte & Touche, the successor to Touche Ross. He is also a unitholder in the Trust and, at the time of trial, had filed a petition in this Court related to the transaction *463 at issue. Mr. Atkins has written three books on data processing functions. In the course of his professional duties, Mr. Atkins routinely acquires information about the cost of computer equipment from the sellers of such equipment as well as from outside research services. However, Mr. Atkins does not consult in the area of computer valuation, nor is he an expert in residual valuation. In December 1982, after the equipment to be involved in the deal was chosen, Mr. Bernikow approached Mr. Atkins regarding the deal. Mr. Atkins was familiar with the IBM Model 3081, which was by far the most valuable piece of equipment involved. At the time of the transaction, Mr. Atkins opined that, the Model 3081 had an economic life of 10 additional years. Mr. Atkins discussed the transaction with Mr. Bernikow and with petitioner, and he opined that the Trust was paying fair market value for the equipment. However, there is no indication that Mr. Atkins took into account the fact that the Trust was to acquire a limited interest in the equipment, and he never placed his evaluation in writing. 2. Charles Biggs
Charles Biggs was also a partner at Touche Ross and a unitholder in the Trust. *464 At the time of trial, Mr. Biggs had a docketed Tax Court case concerning his participation in the Trust. Mr. Biggs is a management consultant, specializing in computer systems and computer installations. His professional duties require that he be familiar with various types of computer equipment and their prices. At the time of the transaction, Mr. Biggs was generally familiar with the European computer marketplace. However, Mr. Biggs was not a valuation expert, and he did no consulting regarding the residual value of computers. Further, Mr. Biggs was not an investment adviser, and he had no experience in computer leasing. Mr. Biggs began evaluating the transaction after Messrs. Crumlish and Jordan had determined the terms of the deal and the equipment to be involved. To evaluate the offering price, Mr. Biggs consulted sources that he maintained in his office. He felt that the price charged to the Trust was the market price of the equipment, but there is no indication that Mr. Biggs took into account the limited interest that the Trust was acquiring. At the time of the transaction, Mr. Biggs felt that each of the pieces of equipment would have an economic life of more than *465 10 years and that it would produce a residual value, after expiration of the Master Leases, of about 25 percent of cost. Mr. Biggs reached his conclusion regarding the residual value of the equipment based on "what I believed the life of that equipment would be and what my general understanding in the marketplace was of the * * * residual value of equipment." He did not consult any sources, and he paid little attention to the appraisal offered by the promoters of the investment. However, Mr. Biggs did discuss the equipment with Mr. Atkins. Mr. Biggs and Mr. Atkins informed the other members of the Trust of their estimates of the equipment's value and of its useful life. Mr. Biggs did not provide a written valuation. D. Unitholders' Evaluation of the Tax and Financial Ramifications
1. Eli Gerver
Eli Gerver is a C.P.A. and a lawyer with a master's degree in taxation. In 1982, he was a senior tax partner in the Stamford, Connecticut, office of Touche Ross. Mr. Gerver had substantial experience representing clients involved in long-term equipment leasing, but he did little, if any, work in computer leasing. Mr. Gerver is a unitholder in the Trust. By the time *466 of trial, the IRS had issued a notice of deficiency to Mr. Gerver regarding his participation in the Trust, and he had filed a petition in this Court. Mr. Gerver learned of the opportunity to participate in the Trust in November or December 1982, and he obtained a copy of the Offering Memorandum that had been provided by the promoters. He reviewed the Offering Memorandum and the Tax Opinion Letter written by Austrian, Lance. Mr. Gerver discussed the transaction with petitioner and advised him that the Tax Opinion Letter documented substantial authority for the depreciation and interest deductions to be claimed by the unitholders. He prepared no written tax opinion for either petitioner or the Trust. He testified that "I wasn't asked for an opinion from the trust. When I came to the trust it was as an investor." Sometime in the 2 years following the transaction, Mr. Crumlish left Touche Ross. Mr. Gerver then, on his own initiative, assumed the responsibility of distributing tax return information to the unitholders. 2. Information Provided to the Trustee and the Other Unitholders
Before the sale-leaseback was consummated, Mr. Atkins and Mr. Biggs talked to Mr. Bernikow, *467 the trustee, about the type, price, and economic life of the computer equipment to be purchased. Mr. Bernikow also discussed with Messrs. Crumlish and Gerver the tax ramifications of investing in the Trust. Mr. Bernikow reviewed the income projections initially provided to him, as well as the revised projections contained in the Offering Memorandum. The potential unitholders met informally and discussed the deal. There were no formal meetings to explain the deal or to monitor its progress. The only organized meeting of the unitholders concerned the audit of the Trust by the IRS, which was initiated in 1986. The only written communications regarding the Trust were annual tax statements distributed to the unitholders. 3. Petitioner's Personal Financial Analysis
Petitioner was the managing partner of the Touche Ross Stamford, Connecticut, office at the time of the sale-leaseback. To that point, petitioner had spent approximately 15 years auditing leasing companies. His duties required him to confirm the existence of lease transactions, to evaluate the present values of future rentals for such leases, and to review projected residual values. Petitioner first heard about *468 the transaction at issue in early December 1982, when discussing possible investment opportunities with two of his partners, Mr. Gerver and Mr. Philip Greenblatt. Thereafter, petitioner contacted Mr. Bernikow and was sent the first set of projections and, shortly thereafter, a copy of the Offering Memorandum. Before deciding to become a unitholder, petitioner read the Offering Memorandum and spoke with many of his partners, including Mr. Atkins and Mr. Gerver. Upon examining the projections, he determined that purchasing six units of the Trust would cost $ 57,240 in cash and that his projected tax savings for the first year would be 87.25 percent of his cash investment. Petitioner was aware that, during the term of the Master Leases, the Trust's note payments would exactly offset the fixed rental payments from the Equilease entities. Therefore, he knew that the only way to make an economic profit was to realize residual value on the equipment in excess of his cash downpayment. Part of this residual value would be composed of proceeds from releasing the equipment between the end of the Initial User Leases and the expiration of the Master Leases. The projections estimate that *469 the Trust would receive $ 914,175 in such "additional income" from 1985 through 1990. Petitioner never inquired about the source of that estimate or questioned its validity. The other component of residual value would be the realizable value of the equipment as of December 1990, the end of the Master Leases. Without factoring in inflation, the projections show that, at 20-percent residual value, each unitholder would approximately break even on his cash investment. At 30 percent, he would earn a 50-percent return on his investment, and at 40-percent residual value, he would double his money. Petitioner never questioned the probability of achieving these returns. Prior to the transaction, petitioner had no experience with the lines of equipment involved in the transaction. In addition, he knew nothing of either Systems or Equilease. Although he read the Offering Memorandum before committing himself to the Trust, petitioner reviewed none of the documents relating to the previous transactions involving this equipment. There is no indication that he raised any questions regarding the substance or implications of those previous transactions. The Offering Memorandum contains projections *470 that differ slightly from the initial projections. However, until the time of trial, petitioner was unaware that the projections had been modified. In December 1982, petitioner purchased six units of beneficial interest in the Trust for $ 57,240. After investing in the Trust, petitioner did not follow the financial success of the leasing venture. He did not keep track of the expiration dates of the Initial User Leases or inquire of the trustee regarding subsequent leases of the equipment. The trustee did not inform petitioner when the Initial User Leases expired. Until 2 weeks before trial, petitioner was unaware that two of the central processing units had been in storage for over 3-1/2 years. E. Purchase by the Trust
Pursuant to a "Purchase, Sale and Assignment Agreement" (Sale Agreement) dated December 28, 1982, the Trust purchased Systems' interest in the foreign IBM, domestic IBM, and CDC equipment and its interest in the Master Leases with the Equilease entities for a stated price of $ 5,170,392. The Sale Agreement provided that the Trust would receive all rents from the Equilease entities that were due to Systems under the domestic and foreign Master Leases. *471 The Sale Agreement states that the Trust bought the equipment subject to the rights of the domestic and foreign initial users and subject to the rights of the Equilease entities under the Master Leases. The Sale Agreement further states that the Trusts' rights would be subordinate to the following interests: (1) The security interests of Burroughs, UJB, and Chemco in the domestic IBM equipment, the CDC equipment, and the foreign IBM equipment, respectively; and (2) the assignment of the rents under the Initial User Leases of the domestic IBM and CDC equipment to Burroughs and UJB. In the Sale Agreement, Systems agreed to continue to make the payments that it owed to the Equilease entities as follows: 4.01 Transferor Indebtedness. Transferor [Systems] agrees: (i) to the extent it receives payments under the Installment Note to pay principal of, and interest on, the Transferor Indebtedness [to Equilease C.V. and Equilease Partnership], when due * * * * * * 7.01 Indemnity by Transferor. Transferor agrees to indemnify Transferee [the Trust], and to protect, defend, and hold it harmless, from and against any and all loss, cost, damage, injury or expense, including, without *472 limitation, reasonable attorneys' fees and other legal expenses, which Transferee may incur for or by reason of: * * * (ii) a breach by Transferor of any of the warranties and agreements of Transferor contained herein or in any of the other Final Documents.
The Trust paid Systems $ 954,000 in cash. The transactional documents characterize $ 917,392 as a downpayment and the remaining $ 36,608 as a prepayment of interest due on the Trust's "Installment Note" in 1983. That Installment Note, issued to Systems in the principal amount of $ 4,253,000, bore an interest rate of 16.75 percent. The note called for quarterly payments of $ 168,942.50 during 1983. For the years 1984 through 1990, the note called for quarterly payments of $ 260,781.95. These note payments precisely equal the total quarterly payments due from Systems to the Equilease entities under the foreign and domestic Purchaser Notes. The note payments also exactly offset the lease payments that the Trust was entitled to from the Equilease entities under the Master Leases. The Trust also entered into two identical "Recognition Agreements". One was with Equilease Partnership and Systems and the other was with Equilease *473 C.V. and Systems. The Recognition Agreements provided that: Vendor [Equilease C.V. or Equilease Partnership] agrees that it will not exercise any of the rights or remedies conferred upon it under the Master Security Agreement on account of a default by Purchaser [Systems] of the type referred to in clause (i) of Section 6 of the Purchaser Note (a "Payment Default"), unless and until it shall have given to Transferee [Trust] notice of the Payment Default and the Payment Default continues uncured for a period of ten (10) days after the giving of such notice and Transferee shall have the right to cure any such Payment Default as provided for in the Purchaser Note, in its capacity as a "Payor" thereunder.
As an accommodation to Systems, National Community Bank of New Jersey (NCB) established accounts in the names of Equilease Partnership, Systems, and the Trust. No funds were ever deposited into any of these accounts. Every month, NCB credited and debited the three accounts with the full amount of the offsetting loan and leaseback payments owed in regard to the domestic IBM and CDC equipment. At all times, each of the accounts had a zero balance. The record does not indicate *474 how the loan and leaseback payments were made with regard to the foreign IBM equipment. Subsequent Leases of the Computer Equipment
Beginning in July 1986, Mr. Bernikow began corresponding with Equilease Corp. in an effort to discover the status of the equipment that had come off lease and to prod Equilease to re-lease the equipment. He found out that the successor to First Computer had released the CDC equipment from January through June 1986, at $ 600 per month, and then on a month-to-month basis for $ 480 per month. The month-to-month lease continued at least through October 1986. The foreign IBM equipment was never re-leased. Burroughs declined to re-lease the domestic IBM equipment when its Initial User Lease expired on April 30, 1987. That equipment was re-leased to the Monsanto Corp. for 24 months, effective May 1, 1987, for $ 15,000 per month. The Trust received its agreed upon share of the rentals from these subsequent leases: Half of the gross proceeds, minus a remarketing fee. On April 30, 1990, 1 year after Monsanto's lease expired, the Trust sold the domestic IBM equipment to Equilease Marketing for $ 5,000. The CDC equipment and the foreign IBM equipment *475 have been in storage since the end of their leases. The total residual proceeds to the Trust from the three groups of equipment equaled approximately $ 150,000. Petitioners' Tax Returns
Petitioners' Federal income tax returns for the years 1982 through 1989 reflect the following amounts of rental income, expenses other than depreciation, depreciation, and net income or loss attributable to their participation in the Trust: Year
Rental Income Expenses
Depreciation
Income/Loss 1982
--
$ 356
$ 47,743
($ 48,099)
1983
$ 40,546
32,800
72,440
(64,694)
1984
62,588
51,265
63,347
(52,024)
1985
62,688
37,530
58,869
(33,711)
1986
63,156
33,060
57,078
(26,982)
1987
63,396
28,038
7,164
28,194 1988
69,096
24,096
3,582
41,418 1989
64,506
18,462
--
46,044 Further, on their Federal income tax return for 1984, petitioners claimed an "amortization" deduction in the amount of $ 104 for the Trust's organizational costs. OPINION Sham Transaction
The first issue for decision is whether petitioners' investment in the domestic IBM, CDC, and foreign IBM equipment through the Trust was a sham transaction devoid of economic substance. Business *476 transactions are not necessarily deprived of economic substance because of the existence of significant tax benefits that accrue to investors. ; . A transaction will not be considered a sham if it is a "genuine multiple party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached". . Petitioners bear the burden of proving that the transactions at issue are not shams. Rule 142(a). The test we apply examines "both the taxpayers' subjective business motivation and the objective economic substance of the transactions". , affg. ; see also , *477 affg. . "The consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional analysis; that is, whether the transaction had any practical economic effects other than the creation of tax losses." , affg. ; see also , affg. ; , affg. in part and revg. in part . A. Economic Substance
A transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for profit exclusive of tax benefits. . In , we observed that *478 several factors are particularly significant in determining whether a computer leasing transaction possesses economic substance. These include the presence or absence of arm's-length price negotiations, the reasonableness of the income and residual value projections, the structure of the financing, the degree of adherence to contractual terms, and -- most important in this case -- the relationship between the sales price and fair market value of the property acquired. See also , supplemented by , affd. without opinion ; ; , affd. in part . We find that the purchase of the interest in the equipment in this case was without economic substance. Although our conclusion is based on all of the facts and circumstances, the following factors are particularly noteworthy in reaching *479 this conclusion. 1. Relationship Between Sales Price and Fair Market Value
The Trust purchased System's interest in the equipment at issue for the stated price of $ 5,170,392. The primary point of fact argued by petitioner and respondent is whether the stated price approximated the fair market value of the computer equipment involved in the deal. The Court received extensive expert testimony regarding valuation of the equipment. However, as becomes clear upon examination of the facts, the Trust purchased only a partial interest in the equipment. It only obtained what Systems held: Legal ownership of the equipment, subordinate to the prior rights of the initial users, the security interests of Burroughs, UJB, and Chemco, and the rights of Burroughs, UJB, and Chemco to receive the rents due under the Initial User Leases. The stated price was not adjusted to account for the limited nature of the interest acquired. Thus, it is clear that the Trust paid an exaggerated price for its limited interest in the equipment. Three series of transactions were carefully orchestrated to inflate the prices of the interests transferred. First, early owners of the three sets of equipment *480 stripped away the rights to the rents due under the Initial User Leases. Using sale-leaseback arrangements, the owners then sold the remaining rights for prices that did not reflect the limited nature of those rights. The bulk of the stated purchase prices were represented by notes. Inflated lease payments offset debt payments on equally inflated notes, and no cash changed hands in regard to the obligations. At the end of each series, the Trust paid overstated prices for the interests in the equipment to secure magnified depreciation and interest deductions. The Trust acquired the domestic IBM and CDC equipment in this manner. The domestic IBM equipment was originally purchased from IBM for $ 4,004,569 in early 1982. CLG Enterprises, an early owner of that equipment, assigned to Burroughs the rents from the Initial User Lease of the equipment. On May 12, 1982, CLG Enterprises sold its remaining interest in the domestic IBM equipment to Equilease Marketing for $ 440,512. Also in 1982, Equilease Marketing bought the CDC equipment from Control Data Corp. for $ 249,622. On September 1, 1982, Equilease Marketing assigned the initial user rents from the CDC equipment to UJB. *481 On December 28, 1982, Equilease Marketing sold its remaining interests in the domestic IBM and CDC equipment to its sister entity, Equilease Partnership, for a stated price of $ 4,425,276.37. In effect, Equilease Partnership agreed to pay more than six times the amount that Equilease Marketing had paid for the Equipment. This sale called for a downpayment of $ 484,530. The balance of $ 3,940,746.37 consisted of Equilease Partnership's "acquiring the Equipment subject to the Applicable Lien". The applicable lien included the assignment of the rents from the Initial User Leases to Burroughs and UJB. Equilease Partnership assumed no debt, and there was no provision made for Equilease Partnership to further compensate Equilease Marketing. Therefore, Equilease Partnership actually paid $ 484,530, rather than the inflated, stated price of $ 4,425,276.37. Also on December 28, 1982, Equilease Partnership entered into a sale-leaseback with Systems involving Equilease Partnerships's newly acquired interests in the domestic IBM and CDC equipment. The stated sales price was $ 4,423,550: $ 609,193 in cash and a note for $ 3,814,357. The payments due from Equilease Partnership under the *482 8-year Master Lease precisely offset the note payments due from Systems. Further, Systems was entitled to withhold payment on its note to the extent that Equilease Partnership did not make its payments under the Master Lease. On that same date, as explained below, Systems sold its interest in the equipment to the Trust at a similarly inflated price. The transactions culminating in the Trust's acquisition of an interest in the foreign IBM equipment are similar. On November 11, 1982, Chemco paid $ 800,435 to acquire: (1) The foreign IBM equipment, subject to the rights of the initial users, and (2) the right to receive the rental income due under the Initial User Leases. One week later, on November 18, 1982, Chemco entered into a sale-leaseback with Equilease International. Equilease International agreed to pay a stated price of $ 1,177,807: $ 85,067 as a cash downpayment and $ 1,092,740 in the form of a note. However, Chemco sold its interest in the equipment only; it retained the right to collect rents from the Initial User Lease. Under the Collateral Assignment Agreement, Equilease International could claim the proceeds of the Initial User Lease only in the event that Chemco *483 defaulted on its lease payments to Equilease International. Such default was highly improbable in the absence of bankruptcy because the note payments due from Equilease International to Chemco exactly mirrored the lease payments due from Chemco. Equilease International assigned its limited interest in the foreign equipment to another sister entity, Equilease C.V., on December 31, 1982. Equilease C.V. had already sold that interest to Systems on December 28, 1982, for a stated price of $ 1,208,996. That price consisted of a cash downpayment of $ 139,034.54 and a note in the principal amount of $ 1,069,961.46. Simultaneously, Equilease C.V. and Systems entered into a Master Lease that called for lease payments from Equilease C.V. that precisely equal the note payments due from Systems. The transactional documents provide that Systems could withhold note payments to the extent that Equilease C.V. failed to make its offsetting lease payments. On the same day, Systems sold to the Trust its interest in all three sets of equipment -- the domestic IBM, CDC, and foreign IBM equipment -- and the Trust assumed Systems' rights and responsibilities with regard to the Master Leases to the *484 Equilease entities. The stated price of $ 5,170,392 consisted of a note in the principal amount of $ 4,253,000 and a total cash payment of $ 954,000 -- $ 917,392 characterized as a downpayment and the remaining $ 36,608 characterized as prepaid interest. The rental payments due to the Trust under the Master Leases exactly offset the payments due from the Trust on its note. As explained above, Systems and the Equilease entities also held identical offsetting liabilities. Thus, absent bankruptcy, none of the parties to this circle of liability would be liable for actual payments on the notes or leases. It is apparent that the Trust purchased interests from Systems that were stripped of much of their value. The Trust held no right to the use of, or the proceeds from, the equipment until the expiration of the Initial User Leases. Further, the Trust held the right to receive only approximately half of the net rental proceeds from the equipment between the end of the Initial User Leases and the end of the Master Leases. The other half of the net rental proceeds would flow to the Equilease entities under the Master Leases. Thus, the interests in the subject equipment were limited *485 residual interests. The experts who testified in this case did not focus primarily on the value of the limited interests that the Trust actually acquired, but on the full fair market value of the equipment involved. However, there is ample evidence in the record for us to come to a conclusion regarding the value of the interests acquired. The parties have submitted extensive expert testimony concerning the anticipated residual value of the equipment as of the end of the Initial User Leases and the end of the Master Leases, viewed as of December 1982. The experts also testified regarding the contingent rent that could have been reasonably anticipated to flow to the Trust between the termination dates of the Initial User Leases and of the Master Leases. In addition, there is documentary evidence of arm's-length sales of the equipment that took place shortly before the transaction at issue. Petitioners offered the expert opinion of Esmond C. Lyons, Jr. Mr. Lyons is founder and president of Ecesis Co., Ltd., a consulting firm that specializes in the computer industry. Mr. Lyons has testified as an expert witness in many cases before this Court. From 1979 through 1986, he was *486 a member of the professional staff of SRI International (SRI), formerly known as the Stanford Research Institute. At SRI, Mr. Lyons provided consulting services "for companies that provide products and services of a computing nature." During his tenure with SRI, Mr. Lyons considered himself to be an expert regarding the computer industry, with emphasis in the following areas: Market management, strategic planning, product and market analysis and evaluation, product pricing and distribution, residual value forecasting, mergers and acquisitions, and international sales and marketing. Prior to his employment with SRI, Mr. Lyons worked in the computer industry as a programmer, sales representative, marketing manager, and vice president of marketing. In testimony outlining the foundations of his valuation, Mr. Lyons stressed that his estimates are based on his belief that technology does not improve at the rapid rate that others in the field tend to predict. However, Mr. Lyons acknowledged that many technical innovations were being discussed in the industry at the time of the transaction, and that major computer companies were attempting to develop some of these technologies at that *487 time. As background to his valuation of the foreign IBM equipment, Mr. Lyons' report states that by late 1982, "there was little discrepancy discernable between domestic U.S. and European prices." He explained that this price similarity results from the arbitrage -- importation of lower priced American equipment into Europe -- that occurs when the price differential is significant. Because of this rough equality, Mr. Lyons used domestic valuations for the foreign IBM equipment. Mr. Lyons' report states that, as of December 1982, the following residual values could be reasonably expected at the end of the Initial User Leases and at the end of the Master Leases: Value After Value After User Leases Master Leases Equipment
Min.
Max.
Min.
Max.
Dom. IBM
$ 537,076
$ 1,074,152
$ 0
$ 358,051
CDC
122,528
181,349
0
56,718
For. IBM
181,948
371,068
8,135
55,305
Total
841,552
1,626,569
8,135
470,074
In his report, Mr. Lyons also estimates the contingent rent that reasonably could be expected to flow from the equipment between the expiration of the Initial User Leases and the end of the Master Leases. Mr. Lyons determined the expected contingent *488 rent by estimating the return that the investors could expect to receive on other investments. He then applied that rate of return to a principal amount equal to the value of the equipment at the end of the Initial User Leases minus its value at the end of the Master Leases. Mr. Lyons' report states that the reasonably expected contingent rent to the Trust would range from $ 659,363 to $ 925,877. The total residual value that the Trust would receive would consist of the residual value after the Master Leases plus the contingent rents. Therefore, combining the figures presented above, Mr. Lyons estimated that the total residual value from the equipment would range from a minimum of $ 667,498 to a maximum of $ 1,395,951. A mathematical error in Mr. Lyon's report accounts for the discrepancy between the $ 1,399,015 maximum contained therein and the $ 1,395,951 figure reported herein. Mr. Lyons explained that he used a modified version of the "SRI Curve" to derive his residual valuations following the Initial User Leases and the Master Leases. The SRI Curve is a graph, created by the Stanford Research Institute, that projects the residual values of computers. In the past, we have *489 accepted the SRI Curve as a basis for predicting future values of computer equipment. See . The creators of the SRI curve based it upon a 5- to 6-year IBM product cycle, and they warned that: "A major limitation in the use of these curves is that they are valid for the period beginning about 1972 and probably will be valid through about 1977 after which time another survey of the market factors should be made."
Mr. Lyons explained that, with the passage of time, the SRI curve must be constantly "adjusted". However, Mr. Lyons did not explain the modifications that he made to the 1975 SRI curve. In addition, Mr. Lyons' testified that "A curve was drawn for each particular piece of equipment. The curve was dependent upon the life or the lives of comparable preceding equipment. And the market factors that existed at the time of the transaction." Mr. Lyons did not submit to the Court copies of the curves that he drew. However, he did submit a copy of the 1975 SRI curve. In support of his conclusions that the equipment would retain substantial value, Mr. Lyons pointed to an article from *490 the Wall Street Journal, dated October 27, 1976, in which the CEO of IBM is quoted as stating that "future changes in product lines will be 'evolutionary' rather than 'revolutionary.'" Mr. Lyons presented little other support. His report states that "the residual value forecasts of other organizations were considered." However, Mr. Lyons cites to none of those forecasts to corroborate his valuation. Petitioners also offered the opinion of Mr. David Thomas, a director of Penn Stream Consultants, a dealer and trader of new and used IBM Computer Equipment, located in London, England. Mr. Thomas' testimony concerned only the foreign IBM equipment. Although Mr. Thomas had worked almost exclusively in Great Britain at the time of the transaction, he was generally familiar with the continental computer market. At the time of trial, Mr. Thomas had been active in some capacity in the European computer business for 17 years. His occupation required him to make determinations of fair market value and residual value of computer equipment. Mr. Thomas prepared a report predicting only the residual values of the foreign IBM equipment as of the end of the Initial User Leases. The report notes *491 that the December 1982 German list prices of the equipment totaled 2.765.660 DM ($ 1,163,753.42). It was his opinion that, when the Initial User Leases expired 48 months after the transaction at issue, the Model 4341 central processing units would still be worth 25 to 30 percent of their total December 1982 German list price of $ 525,790, or approximately $ 131,448 to $ 157,737. The report also predicts that the foreign peripheral equipment would retain about 40 to 43 percent of its December 1982 list price of $ 637,963, or a total of $ 255,185 to $ 274,324 when its Initial User Leases expired 36 months after the transaction. Thus, the report estimates a total residual value of $ 386,633 to $ 432,061 for the foreign IBM equipment at the end of the Initial User Leases. Mr. Thomas did not explain the methodology that he used to arrive at his conclusions, and his report provides no other support of its conclusions. Mr. Thomas testified that his conclusions were based solely on his "knowledge of the marketplace at that time". Further, Mr. Thomas did not project the residual values at the end of the Master Leases, nor did he predict contingent rents. Mr. Thomas indicated that, as *492 of December 1982, the remaining economic life of each of the pieces of equipment would have reasonably been estimated to be 10 years. Respondent countered with the expert testimony of Mr. S. Paul Blumenthal. Mr. Blumenthal was senior vice president of American Technology Appraisal Service (ATAS) from 1977 to the time of trial. ATAS is the valuation consulting division of American Computer Group, Inc. ATAS provides valuation services to major corporations, banks, leasing institutions, governments, and manufacturers. Prior to his employment with ATAS, from 1955 through 1977, Mr. Blumenthal worked in the computer industry in technical, engineering, marketing, and management positions. He has published and lectured extensively on computer valuation issues. Mr. Blumenthal has testified numerous times before this Court as an expert witness. Mr. Blumenthal estimated the residual values of the equipment as of the end of the Initial User Leases and as of the end of the Master Leases, viewed as of December 1982. He also predicted the flow of contingent rents that would have been expected as of December 1982. He drew his estimated residual values from ATAS reports on the same models *493 of equipment that had been prepared in 1981 and 1982 for ATAS clients. Mr. Blumenthal submitted copies of those earlier reports to the Court. Among the many factors considered in arriving at the values stated in the earlier client reports were: Blue Book price reports, news of industry conditions from trade journals, the historic life of predecessor lines of computer equipment, and innovations that were anticipated at the time that the reports were made. In support of his conclusions, Mr. Blumenthal also submitted an article from the September 1982 issue of "Leasing Digest", a computer industry trade journal. The article reported the results of contemporaneous valuations performed by other companies regarding the main piece of equipment, the IBM Model 3081D. It should be noted that Mr. Blumenthal did not gather direct evidence of European prices of the foreign IBM equipment at issue. However, over the years, in the course of his professional duties, he had examined data regarding a large number of European trades of computer equipment. From that data he had found that the value of used equipment in the European market tends to be between 75 percent and 125 percent of the value *494 of the same equipment in the domestic market. We note that Mr. Lyons, petitioners' expert, also testified to this relationship. However, to generate a more generous valuation, Mr. Blumenthal multiplied his domestic residual value for that equipment by a factor of 1.5. Mr. Blumenthal's report states that, as of December 1982, the following residual values reasonably could be expected at the end of the Initial User Leases and at the end of the Master Leases: Value After Value After Equipment
User Leases Master Leases Domestic IBM
$ 339,018
$ 10,000
CDC
49,043
0
Foreign IBM
184,989
0
Total
573,050
10,000
Mr. Blumenthal also gave the following estimates of the contingent rents that could be expected to derive from the equipment between the end of the Initial User Leases and the end of the Master Leases: Domestic
IBM
CDC IBM Other Foreign Equipment
Equipment 4341s IBM Equipment Total $ 210,339
$ 33,287
$ 57,496
$ 116,057
$ 417,179
Thus, adding the two components of residual value, the value following the Master Leases ($ 10,000) and the expected contingent rents ($ 417,179), Mr. Blumenthal produced a total valuation of $ 427,179. *495 At trial, Mr. Blumenthal discussed the steps involved in calculating the applicable lease rate, and, thus, the contingent rents, under his methodology. His report also provides a thorough explanation of that methodology. The report discusses 15 factors to be considered in setting the lease rate on equipment. Those include: (1) List price of the equipment; (2) lease term; (3) prime rate at the time of the transaction; (4) lessor's rate of return after taxes; (5) face value of leveraged loan; (6) leveraged borrowing rate; (7) leveraged loan terms; (8) investment tax credits, if any; (9) anticipated residual value; (10) cost of disposing of the equipment; and (11) depreciation rate. Mr. Blumenthal explained how these factors interact to affect the expected return on a computer lease. Of special interest in this case is the effect that a leveraged purchase has on the necessary rate of return. Mr. Blumenthal worked through detailed examples and explained how interest and depreciation deductions reduce the level of economic return necessary to satisfy an investor. Mr. Blumenthal then went a step further and applied the same methodology to derive the contingent rents from the main *496 asset, the Model 3081D, assuming the residual values that were reported to have been forecast by two other companies, International Data Corp. (IDC) and Computer Economics. The Model 3081D and its associated peripheral equipment constitute the domestic IBM equipment group. The experts in this case valued the group as a whole, rather than as individual pieces of equipment. Mr. Blumenthal's methodology assumes that the evaluators at IDC and Computer Economics did likewise, and petitioner has not questioned this assumption. The September 1982 issue of "Leasing Digest" reports that IDC had predicted that, sometime during 1987, the value of the Model 3081D would fall below 10 percent of list price, or $ 354,250. The same article reports that Computer Economics had more optimistically estimated that the Model 3081D would be worth at least 20 percent of list price, or $ 708,500, until the second half of 1987. Using those dollar values, Mr. Blumenthal applied his methodology to compute contingent rents for the Model 3081D. The IDC estimate results in contingent rent of $ 219,768. The Computer Economics figure results in contingent rent of $ 444,407. Adding each of those figures to *497 Mr. Blumenthal's previously computed contingent rents from the remainder of the equipment ($ 206,840), the total re-lease revenues amount to $ 426,608 using the IDC estimate. Using the Computer Economics estimate, the total is $ 651,247. Given the assistance offered by the experts, we must determine the value of the Trust's limited interest in the equipment. As noted earlier, that interest was essentially the ownership of the equipment after the expiration of the Master Leases plus the right to approximately half of the net rental stream between the end of the Initial User Leases and the end of the Master Leases. Respondent's expert, Mr. Blumenthal, presented a well explained and well documented report. Mr. Blumenthal's conclusions are based on reports that his company completed in 1981 and 1982 concerning these same computer models. We note that some of Mr. Blumenthal's analysis in those earlier reports is based on anticipation of innovations expected to affect the computer market. Although a number of those breakthroughs did not materialize, the question is not who was correct in predicting the events that would actually transpire; rather, the question is what was reasonable *498 to believe in December 1982 about the future residual value of the equipment. . We find reasonable the prognostications that Mr. Blumenthal's company made in 1981 and 1982 regarding the residual value of this equipment as of the dates corresponding to the end of the Initial User Leases and the end of the Master Leases. Using these contemporaneous predictions, Mr. Blumenthal concluded in this case that, at the end of the Initial User Leases, the equipment would be worth $ 573,050, without adjustment for inflation. The September 1982 "Leasing Digest" article regarding the IBM Model 3081D strongly supports Mr. Blumenthal's estimate. Such contemporaneous information from a trade publication is precisely the type of material that would have influenced an investor's opinion in 1982. Mr. Blumenthal's conclusion is further supported by prior sales of the equipment. A short time before the Trust acquired the equipment, the Equilease entities purchased it for a total of $ 569,530. In November 1982, Equilease International paid Chemco $ 85,067 for the foreign equipment, stripped of the initial user rents. On December *499 28, 1982, Equilease Partnership paid Equilease Marketing $ 484,530 for the domestic IBM and CDC equipment, also stripped of its initial user rents. As this Court has stated: When two parties dealing at arms' length assign a certain value to property being sold, and when that value has economic significance to each of the parties, the value assigned by the parties is very persuasive evidence of its fair market value. [, affd. .]
See also ; . We also approve of Mr. Blumenthal's well-explained methodology for deriving re-lease revenues. Under that methodology, the Trust's portion of those revenues equals $ 417,179. Mr. Blumenthal's estimate of the residual value of the equipment as of December 1990, the end of the Master Lease, was $ 10,000. Adding those two sums, Mr. Blumenthal reached his well documented and understandable estimate of the total reasonable expected residual *500 value, $ 427,719. We note that even using the much higher reported estimate by Computer Economics of the residual value of the Model 3081D after the Initial User Leases, total contingent rents of only $ 651,247 are obtained. Petitioners' expert Mr. Thomas offered an estimate of the residual value of the foreign equipment at the end of the Initial User Leases. His range of $ 386,633 to $ 432,061 was far in excess of the estimate of either of the other two experts. Mr. Thomas did not explain the methodology that he used to arrive at his figures, and, therefore, we have little basis on which to judge its reasonableness. In addition, Mr. Thomas did not forecast the stream of contingent rent or the residual value following the Master Leases. He simply stated that his estimated residual values following the Initial User Leases "could reasonably have been expected to be recovered over the remaining economic life of the equipment either through subsequent leases or resale." However, even if we found reasonable Mr. Thomas's residual valuation following the Initial User Leases, his failure to provide estimates of contingent rent and residual value following the Master Leases would seriously *501 limit the value of his opinion. These additional estimates are essential to determining the worth of the interest that the Trust purchased. Any net contingent rents generated between the end of the Initial User Leases and the end of the Master Leases would be divided between the Trust and the Equilease entities. In contrast, the Trust held full rights to all net proceeds from the equipment after the expiration of the Master Leases. Petitioners' other expert, Mr. Lyons, offered estimates of the reasonably foreseeable values of all three sets of equipment. However, like Mr. Thomas, Mr. Lyons offers inadequate support for his conclusions. In addition, Mr. Lyons presented nothing to lessen the impact of Mr. Blumenthal's contemporaneous valuations and the two valuations reported by "Leasing Digest" in September 1982. At trial he offered little more explanation than that his answers were based on his experience. Further, Mr. Lyons submitted an extremely broad ranges of values. His totals ranged from $ 667,498 to $ 1,399,015, for a difference of $ 731,517. We note that even the average of this range, $ 1,033,257, would likely be unattractive to legitimate investors. The prospect *502 of tying up $ 954,000 in cash for 8 years for the chance of receiving a total nominal return of $ 79,257, or 8.3 percent, is hardly enticing. See . Based on the foregoing, we adopt Mr. Blumenthal's figure, $ 427,179, as the value of the interests that the Trust acquired in the three groups of equipment. Based on that valuation, there was no reasonable possibility that the Trust and its unitholders would recoup the cash payment of $ 954,000 made to Systems, and thus we find that they could not realize an economic profit. 2. Other Factors
The evidence shows that there were no bona fide negotiations between Systems and the Trust regarding the majority of the terms of the purchase. Mr. Crumlish, on behalf of the Trust, negotiated only the amount of the downpayment. As discussed above, the note payments from the Trust to Systems would be completely and precisely offset by the lease payments due from the Equilease entities to the Trust. Therefore, in the absence of a bankruptcy, the downpayment constituted the total out-of-pocket cost to the Trust. Thus, the nominal purchase price *503 of the equipment, which was not negotiable, and the interest rate on the note, which was contingent upon the amount of the loan principal, were irrelevant. Our earlier finding that there was no reasonable possibility of making a profit on this deal leads us to believe that the types of equipment and the identities of the initial users were also unimportant to the Trust, except as window dressing. Further, the income and residual value projections that petitioner and his fellow unitholders claim to have relied upon were unreasonable. The projections provided by Systems indicate that the Trust could expect $ 914,175 in net re-lease rents from 1985 through 1990. We have already found that a purchaser could have reasonably expected release rents of approximately $ 417,179. The projections also indicate three possible net residual values for the equipment following the Master Lease terms: $ 930,671, $ 1,163,338, and $ 1,396,006. We have found that a purchaser would have reasonably expected to recover only $ 10,000 at the end of the Master Leases. We note that even petitioners' expert Mr. Lyons, whose estimate we found to be excessive, forecasts a maximum residual value following *504 the Master Leases of only $ 470,074. B. Business Purpose
Generally, we will not apply the business purpose test in situations involving sophisticated investors who should have been aware that the transaction at issue could not achieve a pretax profit. , affd. ; cf. ("We have never held that the mere presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance."). However, even if we were to apply the business purpose test in this case, we would find a complete lack of business purpose. Petitioner bought into the Trust solely to acquire tax benefits; the only purpose of the Trust was to generate those tax benefits. The organizers of the Trust and all of the unitholders were partners and principals in a major accounting firm. Petitioner, as well as other unitholders, had extensive experience with leasing transactions. Certainly, he and the other unitholders had the capacity to discern *505 from the Offering Memorandum the very limited nature of the interest that they were acquiring. A serious examination of the Offering Memorandum reveals that valuable rights in the equipment had previously been assigned away. Petitioner and the other unitholders had ample opportunity to scrutinize the Offering Memorandum. Messrs. Atkins and Biggs informed them that the Trust was paying Systems the fair market value of the equipment. Messrs. Atkins and Biggs did not indicate that they had taken into account the previous assignments and the limited interest that the Trust was to acquire. Petitioner and the other unitholders should have understood that they were agreeing to a grossly inflated price for their limited interest in this equipment. In spite of the clear indications that this deal could turn no economic profit, petitioner purchased a 6-percent interest in the Trust for $ 57,420. He then proceeded to claim a cumulative net loss of $ 225,510 in 1982 through 1986, as a result of his participation in the Trust. From 1987 through 1989, he reported $ 115,656 of income from the Trust. Thus, through 1989, petitioner reported a total, front-loaded net loss of $ 109,854 stemming *506 from his participation in the Trust. Because of the lack of economic substance and business purpose, we hold that the transaction was a sham in substance, and we uphold respondent's disallowance of depreciation deductions. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 95; . In addition, petitioners are not entitled to deductions for interest payments on the Trust's nominally recourse liability to Systems. We will not grant effect to "transactions between * * * organizations created to carry out a tax shelter scheme, notes given for amounts having no relation to economic reality, or notes which almost certainly would not be paid." . The Trust obligated itself to Systems under a note that bears no relation to the value of the asset being purchased. Obligations from the Equilease entities under the equally inflated Master Leases precisely offset the Trust's liabilities. Systems' obligations to the Equilease entities closed the circle of liability. There is no indication that the Trust incurred any *507 purchase cost beyond the downpayment. Even if we were to find that interest was actually paid, interest deductions are impermissible where a debt has been undertaken solely to obtain tax benefits. ; , affg. ; ; . Because we have found for respondent on this issue, there is no need to examine respondent's other arguments regarding the validity of the Trust note, the transfer of the benefits and burdens of ownership, and the "at risk" rules under section 465. Negligence Additions
Respondent has asserted that petitioners are subject to additions to tax under section 6653(a)(1) and (2). Petitioners bear the burden of proving that respondent's determination is wrong. Rule 142(a). Section 6653(a)(1) provides for an addition to tax of 5 percent of the underpayment if any part of the underpayment is due to negligence *508 or intentional disregard of rules or regulations. For purposes of section 6653(a), negligence is defined as the "'lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" (quoting , affg. in part and remanding in part ). In petitioners' opening brief, they argue that if there was an underpayment of tax, petitioners were not negligent because they "acted with due care" and "relied on competent tax advisors". Reliance upon the advice of experts may constitute a defense to the addition to tax for negligence. , affd. ; . We have held this to be the case even where the advice relied upon was erroneous. , *509 affd. . However, a taxpayer's reliance must be reasonable, and blind reliance upon the advice of an expert will not constitute a defense. , affd. . Further, reliance on a tax professional will not absolve taxpayers where they are aware that the "facts" upon which they predicate their deductions are not the facts of the transaction at issue. ; see also . Petitioners have shown this Court nothing to indicate that they acted with "due care". The facts indicate just the opposite. Petitioner and his fellow unitholders purchased limited rights in equipment for an enormously and purposefully inflated price. The Offering Memorandum reveals that rights bearing the majority of the value of the equipment previously had been contracted away and that the Trust was acquiring the equipment subject to the rights of various third parties. Petitioner *510 read the Offering Memorandum. Although supplied with the facts of the deal, petitioner purported to rely on the oral valuations made by Messrs. Atkins and Biggs, which pertained to unencumbered equipment. Petitioner, a partner in a major accounting firm and a professional experienced in leasing transactions, did not act with due care. There is likewise no reason to favor petitioner's claim that he acted under the advice of competent tax counsel. The Offering Memorandum indicates that the "facts" upon which the deductions were based were incorrect. Petitioner was on notice that the valuation that he received from Systems was grossly inflated and that the corroboration of that valuation from his fellow unitholders, Messrs. Atkins and Biggs, was insupportable. See . Therefore, we sustain respondent's determination of additions under section 6653(a)(1) and (2). Addition Under Section 6661
Respondent has also asserted an addition to tax under section 6661. Section 6661(a) provides that if there is a substantial understatement of income tax, there shall be added to the tax an amount equal to 25 percent *511 of any underpayment attributable to such understatement. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown in the return or $ 5,000. Sec. 6661(b)(1)(A). The understatement of tax in this case is greater than both of those amounts. However, the amount of any understatement is to be reduced in regard to any item if there was substantial authority for the treatment of that item claimed by the taxpayer. Sec. 6661(b)(2)(B)(i). Petitioners have produced no authority whatsoever to support their deductions. Therefore, we sustain respondent on this addition. Increased Interest Under Section 6621(c)
Respondent determined that the entire underpayment of tax is a "substantial underpayment attributable to tax motivated transactions" under section 6621(c), formerly section 6621(d). Petitioners bear the burden of proving that respondent's determination is incorrect. Rule 142(a). Section 6621(c)(1) provides that, in the case of a substantial underpayment attributable to a tax-motivated transaction, the annual rate of interest shall be 120 percent of the normal rate of interest applicable to an underpayment. For this purpose, *512 a substantial underpayment attributable to a tax-motivated transaction is defined as an underpayment that is attributable to one or more tax-motivated transactions if the amount of the underpayment for the year exceeds $ 1,000. Sec. 6621(c)(2). The definition of "tax-motivated transaction" includes "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v); see also , affd. without published opinion sub nom. , affd. sub nom. Skeen v. commissioner, , affd. without published opinion , affd. sub nom. ; ; , affd. . Petitioners argue that there is no "tax-motivated transaction" because, inter alia, the transaction at issue was *513 not a sham or fraudulent. However, the facts show that the subject transaction was a sham. Accordingly, we sustain respondent's determination that the transaction is tax motivated for purposes of section 6621(c). Decision will be entered under Rule 155.